**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| LIBERTY MUTUAL INSURANCE COMPANY,<br><br>               Petitioner,<br><br>v.<br><br>NATIONWIDE MUTUAL INSURANCE COMPANY, NATIONAL CASUALTY COMPANY, and EMPLOYERS INSURANCE COMPANY OF WAUSAU,<br><br>               Respondents. | No. |

**LIBERTY MUTUAL'S PETITION UNDER THE FEDERAL ARBITRATION ACT**
**TO APPOINT UMPIRE IN REINSURANCE ARBITRATION**

Petitioner Liberty Mutual Insurance Company ("Liberty Mutual") requests that this Court enter an Order pursuant to Section 5 of the Federal Arbitration Act (the "FAA"), 9 U.S.C. § 5, to appoint an umpire in an ongoing reinsurance arbitration between Liberty Mutual and Respondents Nationwide Mutual Insurance Company ("Nationwide"), National Casualty Company ("National Casualty"), and Employers Insurance Co of Wausau ("Wausau") (collectively, the "Reinsurers").

In support of its petition, Liberty Mutual states:

**NATURE OF THE ACTION**

1.      Liberty Mutual seeks an Order pursuant to Section 5 of the FAA appointing an umpire to preside over a reinsurance arbitration between Liberty Mutual (the reinsured), on the one hand; and Nationwide, National Casualty, and Wausau (the reinsurers), on the other hand – an arbitration commenced by Liberty Mutual to collect more than $6.5 million from the

Reinsurers for their shares of a reinsured loss known to the parties as Armstrong World Industries ("Armstrong"). Specifically, Liberty Mutual seeks to collect reinsurance payments due it for payments it made under policies issued to Armstrong and reinsured by the Reinsurers.

2.      "In essence, reinsurance is insurance for insurance companies … whereby a reinsured … cedes some of its risk to a reinsurer … and shares its premium with the reinsurer." *Certain Underwriters at Lloyd's v. Westchester Fire Ins. Co.*, 489 F.3d 580, 582 n. 1 (3d Cir. 2007) (quoting *North River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1199 (3d Cir. 1995)).

3.      Generally speaking, there are two types of reinsurance contracts: treaty and facultative. *Certain Underwriters at Lloyd's v. Westchester Fire Ins. Co.*, 489 F.3d 580, 582 (3d Cir. 2007) (quoting *Continental Cas. Co. v. Am. Nat'l Ins. Co.*, 417 F.3d 727, 729 n. 1 (7th Cir. 2005)). Treaty reinsurance "involves an agreement by a reinsurer 'to accept an entire block of business from the reinsured'" whereas facultative reinsurance "entails the ceding of a particular risk or policy." *Id.*

4.      The reinsurance relationship at issue is treaty reinsurance.

## THE PARTIES

5.      Liberty Mutual is a Massachusetts insurance company with its principal place of business in Boston, Massachusetts.

6.      Nationwide is an Ohio insurance company with its principal place of business in Columbus, Ohio.

7.      National Casualty is a Wisconsin insurance company with its principal place of business in Wausau, Wisconsin.

8.      Wausau is a Wisconsin insurance company with its principal place of business in Wausau, Wisconsin. Wausau is the successor in interest to Employers Insurance of Wausau A Mutual Company.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because (a) Liberty Mutual; and (b) Nationwide, National Casualty, and Wausau are citizens of different states and the amount in controversy for each reinsurer exceeds $75,000, exclusive of interest and costs.

10.     Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to this claim occurred in this district. Furthermore, the arbitration agreement in the reinsurance treaty calls for arbitration to take place in this district.

11.     Pursuant to Section 6 of the FAA, any application "shall be made and heard in the manner provided by law for the making and hearing of motions." 9 U.S.C. § 6.

## FACTS

12.     Liberty Mutual issued a series of insurance policies to Armstrong from 1973 through and including 1981 under which Armstrong sought coverage for third-party liability claims. After litigating the nature and extent of coverage with Armstrong for nearly thirty years, Liberty Mutual ultimately resolved its disputes by way of a settlement agreement (the "Armstrong Settlement"). Liberty Mutual made a lump-sum settlement payment to the Armstrong World Industries, Inc. Asbestos Personal Injury Settlement Trust (the "Trust") (the

"<u>Armstrong Payment</u>"), pursuant to the terms of the Armstrong Settlement. (*See* Declaration of Alexandra D. Furth ¶ 9, which is being filed simultaneously with this Motion and is attached as Exhibit 1.)

13.     Liberty Mutual and the Reinsurers are parties to the Excess of Loss Reinsurance Contract, which is commonly known to the parties as the General Excess Treaty (the "<u>Treaty</u>"), and which covers Liberty Mutual for the Armstrong Payment. (Ex. 1 ¶¶ 3-6.)

14.     The Treaty contains a follow-the-settlements clause, which provides that "[a]ll loss settlement made … by [Liberty Mutual] shall be unconditionally binding upon the Reinsurers and amounts falling to the share of the Reinsurers shall be immediately due and payable upon reasonable evidence of the amount paid." (An exemplar treaty wording is attached as Exhibit 2; the follow-the-settlements clause is located at Exhibit A (Excess of Loss Reinsurance General Liability), Section 5 (Claims Against Reinsurers).[1])

15.     The Treaty also contains an agreement for arbitration, the wording of which changed over time.

16.     The arbitration agreement in effect in and before 1978 provided as follows:

> In the event of any dispute or difference of opinion, arising with respect to this Contract, it is hereby agreed that such dispute or difference of opinion shall be submitted to

---

[1] The Treaty was reissued from time to time throughout its existence, with some modifications to the wordings. Liberty Mutual is certainly willing to provide the Court with copies of all reinsurance treaty wordings memorializing the Reinsurers' participations on the Treaty should the Court so request.

> arbitration, under Massachusetts General Law (Ter. Ed.),
> Chapter 251, one arbiter to be chosen by the Company
> [Liberty Mutual], one by the Reinsurers, and a third arbiter
> to be chosen by the two arbiters before they enter upon
> arbitration.

(Ex. 2 at Article X.) The arbitration agreement in effect in 1979 and after provided, in pertinent

part, as follows:

> As a condition precedent to any right of action hereunder,
> any dispute arising out of this Agreement shall be
> submitted to the decision of a board of arbitration
> composed of two arbitrators and an umpire, meeting in
> Boston, Massachusetts unless otherwise agreed.
>
> The members of the board of arbitration shall be active or
> retired disinterested officials of insurance or reinsurance
> companies, or Lloyds Underwriters.  Each party shall
> appoint its arbitrator and the two arbitrators shall choose
> an umpire before instituting the hearing.  In the event that
> either party should fail to choose an arbitrator within thirty
> (30) days following a written request by the other party to
> enter upon arbitration, the requesting party may choose
> two arbitrators who shall in turn choose an umpire before
> entering upon arbitration.  In the event the two arbitrators
> fail to agree on an umpire either party shall have the right
> to submit the matter to the American Arbitration
> Association in effect at that time.  . . . .

(Ex. 3 at Article 9.)

17.     On or about February 22, 2010, Liberty Mutual billed the Reinsurers for

their shares of the Armstrong Payment; the amount owed by each reinsurer, exclusive of

interest and costs, is as follows: (a) $3,385,000 due and owing from Nationwide; (b) $300,000

due and owing from National Casualty; and (c) $2,974,243.79 due and owing from Wausau (the

"Armstrong Billing"). (Ex. 1 ¶ 10.)

18.     The Reinsurers failed and/or refused to pay their shares of the Armstrong Billing. (Ex. 1 ¶ 12.)

19.     Accordingly, on December 17, 2010, Liberty Mutual issued a Demand for Arbitration, seeking the Reinsurers' payment of more than $6.5 million due under the Treaty for the Armstrong Billing. (A copy of Liberty Mutual's Demand for Arbitration dated December 17, 2010, is attached as Exhibit 4.)

20.     Liberty Mutual issued a single demand to all three Reinsurers because a single claims-handling service, which is called Nationwide Indemnity Company – Reinsurance Management Services, handles claims for Nationwide, National Casualty, and Wausau for Liberty Mutual's reinsurance billing of Armstrong. Indeed, the same individual – Hannah Huryk, Reinsurance Claim Manager – was handling Liberty Mutual's Armstrong claim on behalf of all three Reinsurers at the time the underlying arbitration commenced. (True and correct copies of letters from Ms. Huryk on behalf of Nationwide, National Casualty, and Wausau all dated October 26, 2010, are attached as Group Exhibit 5.)

21.     The Reinsurers responded to Liberty Mutual's Demand for Arbitration on January 11, 2011, (a) asserting a counter-demand for arbitration; and (b) stating that they were "willing to agree to the consolidation of these contracts in a single arbitration, provided we can agree on a single date for the simultaneous exchange of party-appointed arbitrator names." (A copy of the Reinsurers' letter dated January 11, 2011, is attached as Exhibit 6.) The Reinsurers proposed the date of January 28, 2011, as the date for simultaneous appointment of party arbitrators.

22.     On January 13, 2011, Liberty Mutual accepted the Reinsurers' proposal. (A copy of Liberty Mutual's letter dated January 13, 2011, is attached as Exhibit 7.)

23.     Pursuant to agreement of the parties for simultaneous appointment of party arbitrators, the Reinsurers on January 28, 2011, appointed Spiro K. Bantis as arbitrator. (A copy of the Reinsurers' e-mail dated January 28, 2011, is attached as Exhibit 8.)

24.     Liberty Mutual appointed Paul E. Dassenko as arbitrator. (A copy of Liberty Mutual's letter dated January 28, 2011, is attached as Exhibit 9.)

25.     On February 21, 2011, Liberty Mutual sent a proposed Umpire Questionnaire and Umpire Selection Protocol to the Reinsurers by e-mail. The proposed Umpire Questionnaire is a standardized form published by ARIAS-US, the leading reinsurance industry organization dedicated to training and certifying reinsurance professionals who serve as arbitrators to assist them with necessary and appropriate disclosures. (A true and correct copy of Liberty Mutual's e-mail dated February 21, 2011, with attachments, is attached as Exhibit 10.)

26.     Claiming that obtaining disclosures from the prospective umpire candidates would "slow down the process," the Reinsurers on March 1, 2011, stated that they refused to use questionnaires. (A true and correct copy of the Reinsurers' e-mail dated March 1, 2011, is attached as Exhibit 11.)

27.     On March 2, 2011, Liberty Mutual responded, stating that "it must insist on the use of the standard questionnaire (or a slightly modified version thereof) so the prospective umpire candidates can make the necessary disclosures, which the parties can

evaluate in the process of trying to select a neutral candidate." (A true and correct copy of Liberty Mutual's letter dated March 2, 2011, is attached as Exhibit 12.)

28.     Even though they claimed that obtaining appropriate disclosures would "slow down the process," the Reinsurers failed to respond for nearly two weeks, stating, on March 14, 2011, that they "will not agree to any umpire selection protocol that includes the exchange of questionnaires." (A true and correct copy of the Reinsurers' e-mail dated March 14, 2011, is attached as Exhibit 13.)

29.     The fact that the Reinsurers are so adamant against using the standard umpire questionnaire raises serious concerns.

30.     Nevertheless, in the spirit of compromise, but with a sense of urgency, Liberty Mutual responded that same day, March 14, 2011, (a) asking the Reinsurers to explain why they were "opposed to having candidates make disclosures prior to completing the selection process" and (b) stating that it would forego use of standardized questionnaires provided that the prospective candidates disclosed key pertinent information, including their contacts with the parties, with counsel, and with the arbitrators. (A true and correct copy of Liberty Mutual's letter dated March 14, 2011, which sets forth the key pertinent information it proposed asking the candidates to provide, is attached as Exhibit 14.)

31.     On March 17, 2011, the Reinsurers stated that they "will not agree to use questionnaires," but failed to indicate whether they would agree to soliciting disclosure of key pertinent information. (A true and correct copy of the Reinsurers' e-mail dated March 17, 2011, is attached as Exhibit 15.)

32.     Accordingly, on March 17, 2011, Liberty Mutual again invited the Reinsurers to indicate whether they would not agree to asking for disclosure of key pertinent information. (A true and correct copy of Liberty Mutual's letter dated March 17, 2011, is attached as Exhibit 16.)

33.     On March 18, 2011, the Reinsurers stated that they refused to even try to find common ground with regard to soliciting key pertinent disclosures from prospective umpire candidates. (A true and correct copy of the Reinsurers' e-mail dated March 18, 2011, is attached as Exhibit 17.)

34.     Because of the refusal of the Reinsurers to negotiate in good faith with Liberty Mutual regarding the solicitation of key pertinent information from prospective umpire candidates, Liberty Mutual asked the arbitrator it appointed, Mr. Dassenko, to reach out to the arbitrator appointed by the Reinsurers, Mr. Bantis, to see whether the arbitrators could reach an agreement. (Declaration of Daniel J. Neppl ¶ 4, which is being filed simultaneously with this Motion and is attached as Exhibit 18.)

35.     On March 21, 2011, Mr. Dassenko spoke with Mr. Bantis about a process for trying to select a neutral umpire to preside over the ongoing arbitration. Mr. Dassenko proposed to Mr. Bantis that they ask the prospective umpire candidates to make their necessary and customary disclosures by use of an umpire questionnaire, but Mr. Bantis opposed using questionnaires. (Declaration of Paul E. Dassenko ¶ 10, which is being filed simultaneously with this Motion and is attached as Exhibit 19.)

36.    Mr. Dassenko subsequently proposed to Mr. Bantis that each arbitrator nominate an equal number of prospective umpire candidates (e.g., three), all but one of which the non-nominating arbitrator would decline, and then Messrs. Bantis and Dassenko would (a) interview the two remaining umpire candidates by phone by asking them to make their necessary and customary disclosures involving the parties, the arbitrators, counsel, the subject matter of the arbitration, and any other issues that might affect their ability to serve as neutral umpires; and (b) ask each prospective umpire candidate to confirm in writing to Messrs. Bantis and Dassenko the oral disclosures made to them. Mr. Bantis agreed to this process. (Ex. 19 ¶ 11.)

37.    Subsequently, on April 1, 2011, counsel for the Reinsurers attempted to reinsert himself in negotiating umpire selection. (A true and correct copy of the Reinsurers' e-mail dated April 1, 2011, is attached as Exhibit 20.)

38.    Consistent with the agreement reached among the arbitrators on March 31, 2011, Mr. Dassenko contacted Mr. Bantis on April 4, 2011, to ask whether Mr. Bantis was prepared to exchange names of prospective umpire candidates. Implicitly acknowledging the agreement, Mr. Bantis responded by stating that he would "follow up with Nationwide's counsel to consult on an umpire slate." (Ex. 19 ¶ 12.)

39.    Because the arbitrators appeared to be making progress on a process for selecting an umpire, Liberty Mutual's counsel responded to the attempt by counsel for the Reinsurers to reinsert himself in the umpire selection process. Liberty Mutual's counsel advised the Reinsurers' counsel that they should "let the arbitrators continue with their process." (A true and correct copy of Liberty Mutual's e-mail dated April 6, 2011, is attached as Exhibit 21.)

40.     The Reinsurers' counsel responded by announcing that there was no "agreement" between the arbitrators and attempting to insert himself, yet again, in the umpire selection process. (A true and correct copy of the Reinsurers' e-mail dated April 6, 2011, is attached as Exhibit 22.)

41.     That same day, Mr. Dassenko attempted to continue facilitating umpire selection by proposing to increase the number of candidates each arbitrator nominated in the hopes of finding a "match." (Ex. 19 ¶ 13.)

42.     After receiving this communication from counsel for the Reinsurers, Liberty Mutual's counsel spoke with Mr. Dassenko who indicated that Mr. Bantis had subsequently stated he "misunderstood" the agreement reached by the arbitrators to select an umpire. Liberty Mutual's counsel nevertheless advised the Reinsurers' counsel that they should allow the arbitrators to continue their negotiations to try to come up with a process that would allow for selection of a fair and impartial umpire. (A true and correct copy of Liberty Mutual's e-mail dated April 8, 2011, is attached as Exhibit 23.)

43.     Yet again, the Reinsurers' counsel refused to allow the arbitrators to negotiate an umpire selection process, insisting – after counsel had been unsuccessful in reaching common ground – that he be involved, notwithstanding the fact that the arbitration agreement expressly calls for the two party appointed arbitrators to try to choose the umpire. (A true and correct copy of the Reinsurers' e-mail dated April 8, 2011, is attached as Exhibit 24.)

44. On April 14, 2011, after having received no communication from Mr. Bantis since April 5, Mr. Dassenko again reached out to Mr. Bantis to find out whether they could try to agree on an umpire. (Ex. 19 ¶ 14.)

45. As of the filing of this Motion, there has been no response and the two party appointed arbitrators have been unable to agree on an umpire. (Ex. 18 ¶ 5; Ex. 19 ¶ 14.)

### CLAIM FOR RELIEF

46. Section 5 of the FAA provides as follows:

### § 5. Appointment of arbitrators or umpire

If in the agreement provision be made for a method of naming or appointing an arbitrator or arbitrators or an umpire, such method shall be followed; but if no method be provided therein, or if a method be provided and any party thereto shall fail to avail himself of such method, or if for any other reason there shall be a lapse in the naming of an arbitrator or arbitrators or umpire, or in filling a vacancy, then upon the application of either party to the controversy the court shall designate and appoint an arbitrator or arbitrators or umpire, as the case may require, who shall act under the said agreement with the same force and effect as if he or they had been specifically named therein; and unless otherwise provided in the agreement the arbitration shall be by a single arbitrator.

9 U.S.C. § 5.

47. Nearly four months have passed since Liberty Mutual demanded arbitration and nearly three months have lapsed since the parties appointed their arbitrators, but still no umpire has been appointed.

48. There has plainly been a lapse here in naming an umpire and Liberty Mutual has elected as the appropriate remedy to avail itself of the Court's jurisdiction to

designate and appoint an umpire as expressly authorized by Congress in Section 5.

49.    Because the Reinsurers have failed and/or refused to seek the most basic necessary and customary disclosures from prospective umpire candidates and otherwise failed to negotiate in good faith the selection of a neutral umpire, Liberty Mutual requests that the Court determine that the Reinsurers have waived their right to propose any prospective umpire candidate and that the Court appoint one of the prospective umpire candidates identified in Liberty Mutual's Memorandum of Law in Support of Its Motion Under the Federal Arbitration Act to Appoint Umpire in Reinsurance Arbitration (which is incorporated by reference) according to the process described in Liberty Mutual's Memorandum or by such other process as the Court deems appropriate.

WHEREFORE, for the foregoing reasons, Petitioner Liberty Mutual Insurance Company respectfully requests that the Court (i) enter an Order pursuant to Section 5 of the FAA, 9 U.S.C. § 5, appointing one of the prospective umpire candidates identified in Liberty Mutual's Memorandum of Law in Support of Its Motion Under the Federal Arbitration Act to Appoint Umpire in Reinsurance Arbitration according to the process described in Liberty Mutual's Memorandum or by such other process as the Court deems appropriate; and (ii) grant Liberty Mutual any other relief the Court deems appropriate, including but not limited to its costs incurred in this matter.

*    *    *

### REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1(d), Liberty Mutual respectfully requests a hearing on this Petition.

Dated:  April 15, 2011          Respectfully submitted,

                                LIBERTY MUTUAL INSURANCE COMPANY


                                 /s/ Michael J. Pineault
                                Michael J. Pineault (BBO# 555314)
                                CLEMENTS & PINEAULT, LLP
                                24 Federal Street
                                Boston, MA 02110
                                857-445-0135
                                mpineault@clementspineault.com



OF COUNSEL:

Susan A. Stone (*pro hac vice* application pending)
Daniel J. Neppl (*pro hac vice* application pending)
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on April 15, 2011, which specifically includes:

Keith A. Dotseth
Melissa M. Weldon
LARSON KING LLP
2800 Wells Fargo Place
30 East Seventh Street
St. Paul, Minnesota 56101
kdotseth@larsonking.com
mweldon@larsonking.com

A courtesy copy was also sent to counsel identified above via e-mail.

  /s/ Michael J. Pineault
Michael J. Pineault